# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**BARTO USRY,**

       **Plaintiff,**

**v.**                                   **Civil action no. 5:11cv141**
                                             **(Judge Stamp)**

**UNITED STATES OF AMERICA,**

       **Defendant.**

## REPORT AND RECOMMENDATION

### I.   Factual and Procedural History

On October 14, 2011, the *pro se* plaintiff, Barto Usry, filed this action pursuant the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* On October 17, 2011, the Clerk of Court issued a deficiency notice, directing the plaintiff to complete: his complaint on a court-approved form; an application to proceed *in forma pauperis* ("IFP"); a Consent to Collect; and a Prisoner Trust Account Report, and file all with the Court within twenty-one days. On November 7, 2011, the plaintiff complied. By Order entered November 17, 2011, the plaintiff was granted IFP status and directed to pay an initial partial filing fee. On December 27, 2011, plaintiff filed a letter motion requesting additional time in which to pay the fee. By Order entered January 6, 2012, plaintiff's request for an extension of time was granted. On January 23, 2012, plaintiff paid his initial partial filing fee.

On February 2, 2012, the undersigned made a preliminary review of this matter and determined that summary dismissal was not warranted. Accordingly, the Clerk was directed to issue 60-day summonses for the named defendant, the United States Attorney's Office for the Northern District of West Virginia and the Attorney General for the United States of America. By Order

entered on March 14, 2012, plaintiff was directed to provide copies of his medical records; on March 22, 2012, plaintiff moved for an extension of time in which to produce the records.

On April 2, 2012, the defendant filed a Motion to Serve Pleadings by Unconventional Means,[1] and on April 3, 2012, a Motion to Seal, and a Motion to Dismiss, together with numerous exhibits and a memorandum of law in support. Because plaintiff is proceeding *pro se,* on April 4, 2012 a Roseboro[2] Notice was issued. As well, an Order was entered, granting the defendant's motion to serve its response by unconventional means and directing that the defendant file its response under seal. The same day, the defendant moved for an Order directing that the plaintiff's response and reply, if any, be filed under seal as well. By Order entered the same day, the plaintiff's response and reply, if any, were directed to be sealed and defendant's earlier motion to seal its own response was denied as moot.

On April 11, 2012, a Sealed Order Setting *Ex Parte* Evidentiary Hearing and Argument was entered by the Court, setting a hearing date for May 3, 2012. An Order was also entered, granting defendant's motion to serve pleadings by unconventional means until further order of the Court. That same day, plaintiff filed an Objection to Order Directing that Response be Filed Under Seal and Served Through Unconventional Means.

On April 16, 2012, plaintiff sent a letter to the undersigned, detailing his difficulties with accessing filed documents as a result of the unconventional method of service, asserting that some documents were never received, and requesting an extension of time in which to respond to the

---

[1] Because the prison gang attack allegations in plaintiff's FTCA complaint could have placed him "at risk of an attack or retribution by other inmates" if the information became known to the inmate population, the defendant requested to serve its responsive pleadings upon the plaintiff's Unit Manager, instead of directly upon the plaintiff, because of the security concerns to plaintiff, should another inmate inadvertently see copies while they were in plaintiff's possession. (Dkt.# 24 at 1).

[2] Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (finding that the court must inform a *pro se* plaintiff of his right to file material in response to a motion for summary judgment).

defendant's Motion to Dismiss. By Sealed Order entered on April 18, 2012, plaintiff was granted the extension of time and the Clerk of Court was directed to re-mail, via certified mail, to plaintiff's Unit Manager, certain motions and Orders from the docket, along with a copy of the docket sheet. A Sealed Order was also entered, granting plaintiff's motion for an extension of time in which to produce his medical records.

On April 30, 2012, plaintiff filed a copy of his medical records under seal.[3]

On May 3, 2012, the *ex parte* evidentiary/motion hearing was held. Counsel for the defendant, Alan G. McGonigal, Assistant U.S. Attorney ("AUSA") appeared and produced two witnesses, Lt. Javier Vargas, Correctional Officer, FCI Butner, and Douglass Willis, Unit Manager, FCI Butner, who both appeared by telephone. Plaintiff was not present. After testimony and argument, a Sealed Order Confirming Pronounced Order of the Court Regarding Service of Pleadings by Unconventional Means was entered, directing that the current method being utilized for unconventional service of pleadings to plaintiff be continued.[4]

On May 4, 2012, the plaintiff filed a Motion for Leave to File First Amended Complaint, attaching to it a copy of the First Amended Complaint, a sworn affidavit and an unsworn affidavit. By Order entered May 9, 2012, plaintiff was granted leave to amend his complaint. On May 9, 2012, an Order was entered directing the Clerk of Court to seal the Complaint; the Motion for Leave to File the First Amended Complaint; and the First Amended Complaint. On May 17, 2012, the defendant filed a Supplemental Memorandum of Law in Support of Motion to Dismiss in response to plaintiff's amended complaint. On June 4, 2012, the plaintiff filed a Plaintiff's Certificate of Confidentiality for

---

[3] The medical records are incomplete.

[4] Further, the Court ordered that each time plaintiff was given access to a new document filed, or repeat access to any other document previously filed, the involved BOP employee providing access was to send an email to the AUSA, certifying that access was provided.

Submission of Sealed Documents, and a Reply to the United States' Motion to Dismiss. Plaintiff

filed additional medical records under seal on July 20, 2012. (Dkt.# 66).

This matter is now pending before me for a Report and Recommendation.

## II. The Pleadings

### A. The Complaint

The plaintiff, now an inmate at FCI-2 Butner, in Butner, North Carolina, was previously

incarcerated at FCI Gilmer, in Glenville, West Virginia. Plaintiff asserts that while at FCI Gilmer, as

the result of FCI Gilmer staff's negligence, he was not kept separate from a member of the "Dirty

White Boys" ("DWB"), a prison gang well known to the Bureau of Prisons ("BOP") as one from

whom he should have been protected, because of his history of having been threatened and then

severely beaten by members of this gang before at previous BOP facility.[5] Plaintiff alleges that when

---

[5] Plaintiff was, for years, a former member of the DWBs himself. He avers that once sworn as members, DWBs are members for life. (Dkt.# 54-2, ¶4 at 1). DWB protocol requires that members identify themselves with a distinctive gang tattoo. (Dkt.# 54-1 at 1-2). An inmate who withdraws from DWB membership is forever marked for murder on sight by the rest of the gang. (Dkt.# 65-1 ¶ 5 at 2). In spite of this dire prospect, some time between 2006 and March, 2007, while incarcerated at USP Lewisburg, plaintiff decided to disassociate with the DWBs, and informed the DWB leadership and members at USP Lewisburg of his intent to do so. (Id. at 2). In March, 2007, plaintiff finally "covered up" his DWB tattoo, superimposing another over it to obliterate it, demonstrating permanent DWB disassociation. (Id. at 2). On July 2, 2007, the DWBs at USP Lewisburg advised plaintiff to "check in" to protective custody or face murder or an ominous beating. He was placed in the SHU that day, and remained there till he was transferred to another facility in December 2007. (Id.). Before transfer, however, USP Lewisburg Security Investigative Services ("SIS") interviewed him extensively regarding the DWB, to determine the need for transfer. (Id. at 2-3). Plaintiff contends that USP Lewisburg's transfer packet, made part of his BOP Central File, specifically directed that he should be kept separate from DWBs, warning that if he were placed in general population with DWBs, violence would be imminent. Plaintiff alleges that the "transfer packet was endorsed in writing by executive staff members and the necessity for separation from other [DWBs] . . . was expressed by Unit Manager Hollenbach in a memorandum addressed to other staff members for the purpose of documenting in the plaintiff's central file the facts mandating . . . plaintiff's segregation from DWBs at all times. . . . effectuat[ing] a permanent separatee status viv [sic] a vis the plaintiff and members of the DWBs." (Id. at 3). Between December 2007 and October 30, 2008, the plaintiff was briefly incarcerated at USP Atwater, California, and at several holdover facilities, arriving at USP McCreary on October 30, 2008. Plaintiff alleges that upon his arrival at USP McCreary, he was interviewed by Ms. Woods, a Unit Counselor, who he knew from a previous incarceration at Manchester, KY. She asked whether he was still "running with" DWBs; plaintiff told her he had disassociated from the gang. She took him to SIS Officer Marschino, USP McCreary's gang coordinator, who asked plaintiff if he thought there would be "a problem" with the DWBs in USP McCreary's general population; plaintiff explained that he had obliterated his gang tattoo. Marschino asked him if he personally knew any of the DWBs on McCreary prison yard, and plaintiff reported that he did. Marschino opined that USP McCreary "had a pretty good crew of DWBs," and that he would place plaintiff in the general population for the night, but instructed plaintiff to "holler" at the DWBs first thing in the morning, saying "[i]f they have a problem [with you] they will tell you to leave." Accordingly, plaintiff left SIS and went to his assigned unit. (Id. at 4). Immediately after breakfast the following morning, plaintiff was brutally attacked by a group of

he was first transferred to FCI Gilmer,[6] he advised security staff that he could not be around any DWB gang members and was assured that there were none on the compound. Accordingly, FCI Gilmer staff placed him in the general population. Plaintiff alleges that after later spending some time segregated in FCI Gilmer's Special Housing Unit ("SHU") for a disciplinary proceeding, unbeknownst to him, a DWB gang member was admitted to the general population. On February 14, 2011, shortly after plaintiff got out of the SHU, this DWB inmate attacked and severely kicked and beat plaintiff with a metal pipe about the face and head, causing serious, permanent facial, oral and head injuries.[7]

Plaintiff asserts that defendant's sovereign immunity is waived with respect to his claim; that the Court has proper subject matter jurisdiction; and the defendant's negligence does not fall under any "discretionary function exception," because the defendant had a specific policy to adhere to, set forth in BOP Program Statement 5290.15, subsection 7, last paragraph:

---

at least five DWBs in the prison yard in an unprovoked, near-fatal beating. (Dkt.# 1 at 2 and Dkt.# 1-4 at 3). His injuries from the October 31, 2008 attack, as best as can be gleaned from the incomplete medical records, include: a head injury with "eye/brain bleed" (Dkt.# 66-1 at 1); unspecified brain damage, resulting in vertigo, balance problems, and difficulty with articulation; a right orbital "blow-out" fracture of the eye socket, requiring surgical repair; a large gash on the forehead requiring sutures; damage to three cervical discs, resulting in chronic, severe neck pain radiating into his shoulders, arm, hand(s) and fingers, tingling in his right arm, 4th and 5th fingers; and possibly back pain with numbness in his legs. (Dkt.# 49-1 at 1, 4 and 6; 54-1 at 4-5; 28-4 at 1). After the assault, plaintiff was transported via MedEvac to a trauma center, where he received several days of unspecified Intensive Care Unit treatment for his brain injury. (Dkt.# 54-1 at 4-5, and 28-4 at 1). Presumably prompted by the results of a December 11, 2008 cervical spine MRI, plaintiff was transferred to the Federal Medical Center ("FMC"), Springfield, Missouri, where he received therapy and remained until the first week of March, 2010. (Dkt.# 54-1 at 6 and 66-1 at 3). He was then transferred back to USP McCreary where he was kept segregated in the SHU until he was transferred to FCI Gilmer.

[6] Plaintiff arrived at FCI Gilmer in August, 2010.

[7] Plaintiff's February 14, 2011 injuries and symptoms (again obtained from a review of incomplete medical records) included at least a head injury with loss of consciousness; dizziness; frontal pressure; lacerations; hemorrhage; a bloody nose; abrasions; contusions; bilateral black eyes; swelling; puncture wounds; and the breaking off or knocking out (it is unclear which) of all of his front top teeth. Following the attack, the plaintiff was medically assessed and received emergency treatment at the prison's Health Services and was then transported to WVU Medical Center by ambulance for treatment, including teeth extraction and mouth repair. (Dkt.# 49-1 at 13-15, 16-17, and 21-22).

To ensure that separates are not housed together, staff shall access the newly received inmate's SENTRY-generated Intake Screening form and thoroughly review the CIM[8] Clearance and Separatee Data to identify any separates currently housed in the institution. Staff may cross check the names of separates with an alphabetical list of all inmates in the institution.

Plaintiff asserts that if he had known the DWB inmate had been admitted to FCI Gilmer's general population, he would have refused to return to the compound and would not have been injured. The plaintiff alleges that the defendant was negligent in allowing him to be released from the SHU without screening taking place to ensure that no DWB gang members had arrived in the interim. He alleges that the FCI Gilmer SIS[9] staff knew or should have known, based on his own BOP records, the serious safety concern that the DWB gang posed to him, that the defendant had a duty to protect him, and that the defendant's breach of that duty proximately caused his injuries. Accordingly, as relief, the plaintiff seeks $50,000.00 in damages against the United States.[10]

## B.  Defendant's Motion to Dismiss

Attached to its motion to dismiss, the defendant provides several affidavits from various BOP employees; proof of plaintiff's exhaustion of administrative remedies; copies of two BOP Program Statements; a copy of an August 17, 2010 Intake Screening Form for plaintiff; and an excerpt from plaintiff's May 14, 2010 transfer documentation from USP McCreary. The defendant seeks the dismissal of this case for following reasons:

---

[8] "CIM" refers to BOP's Central Inmate Monitoring System, which monitors and controls the transfer, temporary release (e.g., on writ), and community activities of certain inmates who present special needs for management. Such inmates, known as CIM cases, require a higher level of review which may include Central Office and/or Regional Office clearance for transfers, temporary releases, or community activities. This monitoring is done to provide protection to all concerned and to contribute to the safe and orderly operation of federal institutions. See BOP Program Statement 5180.05 and 28 C.F.R. §§524.70 – 76.

[9] "SIS" is the BOP's Special Investigative Services, the department charged with investigating criminal incidents occurring within BOP facilities.

[10] The plaintiff timely filed an administrative tort claim with the BOP, seeking $50,000 in damages, claiming that BOP staff was negligent in failing to protect him from assault, causing him to suffer severe and permanent injuries. (Dkt.# 1-3 at 1). The claim was finally denied on June 22, 2011, purportedly because an investigation into the assault revealed that staff "did not have any prior information that could have prevented the assault." (Id.).

1. the Court lacks subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) because the actions complained of fall within the discretionary function exception to the FTCA;

2. the only mandatory duty the defendant had upon plaintiff's arrival at FCI Gilmer was to determine that plaintiff had no separatees at the facility, which the defendant did; and

3. plaintiff's claim must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), because no agent of the United States was the proximate cause of plaintiff's injuries; rather, the assailant who attacked plaintiff was the intervening illegal act, precluding a finding that the BOP officials actions constituted the proximate cause of plaintiff's injuries.

## C. First Amended Complaint

The plaintiff reiterates and expands upon his previous claims in much greater detail, now alleging that the defendants were also negligent in their initial screening of the DWB inmate assailant "Bubba," upon his arrival at FCI Gilmer, in that they failed to physically inspect Bubba to determine if he had a DWB tattoo, i.e., was a current member of the DWB; failed to review Bubba's CIMS,[11] SENTRY[12] and other Central File records to determine his DWB affiliation; and failed to make proper case management and ministerial decisions, to ensure that plaintiff and Bubba were not housed together. Specifically, plaintiff alleges that the defendant's staff failed to comply with 28 C.F.R. §522.20 *et. seq.;* 28 C.F.R. §524.72; 28 C.F.R. §524.75; BOP Program Statements 5290.15, Central Inmate Monitoring System, and 5180.05, Intake Screening,[13] and in failing to perform mandatory duties set forth in the CIM Operations Manual designated "Limited Official Use Only,"

---

[11] A CIMS separatee status designates "[i]nmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the inmates concerned) with other specified individuals" in BOP custody. Parrot v. United States, 536 F.3d 629, 631 (7th Cir. 2008) citing 28 C.F.R §524.72(f).

[12] "SENTRY" is the BOP's real-time information database consisting of various applications for processing sensitive but unclassified inmate information and for property management. Data collected and stored in SENTRY includes information relating to the care, classification, subsistence, protection, discipline, and programs of federal inmates. SENTRY was developed and implemented in 1981 . . . is continually updated [and] . . . contains information on . . . identification data including, but not limited to: name, date of birth, Social Security number, inmate register number . . . physical description, sex, race . . . photographs, digital image . . . institution designation and housing assignments, including separation orders . . . . prison conduct records, including disciplinary actions and reviews, and participation in . . . assaults, and disturbances . . . physical and mental health data . . . transfer information, including dates and destinations . . . administrative remedy-related records; investigatory information [.] See < http://www.bop.gov/foia/sentry.pdf > (emphasis added).

[13] Because the requirements of 28 C.F.R. §522.20 *et. seq.;* 28 C.F.R. §524.72; and 28 C.F.R. §524.75 are incorporated within BOP Program Statements 5290.15 and 5180.05, only the BOP Program Statements will be referred to hereafter.

access to which is precluded by specific policies. Plaintiff contends that the defendant's BOP staff failed to comply with these Federal Regulations and Program Statements, all of which mandate how initial screening of an incoming federal inmate is to be performed; how a social interview is to be conducted; how inmate records are to be flagged; how members of Disruptive Groups are to be kept segregated; and how separatees are to be kept separated from one another at all times. Further, he alleges, the defendant's staff was negligent in failing to inspect his body to verify that he had obliterated his own DWB tattoo, evincing his disassociation with the DWBs, a decision which placed him in mortal danger should he ever be housed with any DWB. Plaintiff alleges that the defendant's staff's breach of its duty of care to him was done "carelessly, negligently, and recklessly with deliberate indifference" to his health and safety, and his Eighth Amendment right to be protected from cruel and unusual punishment via violence from other prisoners.

Plaintiff alleges that the defendant's negligence proximately caused his permanent injuries to his teeth, mouth, face and body, pain and suffering; loss of earning potential; past and future medical bills and expenses; physical pain, suffering and emotional trauma; costs and special damages, and future attorneys' fees. He again asks for a judgment in the amount of Fifty Thousand Dollars.

**D.  Defendant's Supplemental Memorandum of Law in Support of Motion to Dismiss**

Attached to its Supplemental Memorandum in Support of its Motion to Dismiss, the defendant provides a Supplemental Declaration from a FCI Gilmer SIS Lieutenant and a copy of one page from a January 2009 SIS investigation at USP McCreary. The defendant reiterates its claim that the FTCA discretionary function exception bars plaintiff's claims and that the case should be dismissed, for following reasons:

1)  there was no mandatory duty for FCI Gilmer staff to keep plaintiff separate from DWBs.

2)  Plaintiff's allegations regarding FCI Gilmer staff's alleged failure to properly screen plaintiff and his assailant are based on incorrect assumptions and lack merit; and

3) any claim plaintiff is making against the defendant for the prior attack by the DWB while at USP McCreary in October 2008 is barred by the statute of limitations.

**E. Plaintiff's Reply to United States' Motion to Dismiss**

The plaintiff reiterates his objections to the service of pleadings, motions and orders by unconventional means, contending that it creates an obstacle to the litigation of his claims. He argues that the defendant's motion to dismiss should be denied, and that the defendant failed to prove it is entitled to summary judgment as an alternative remedy.

The plaintiff again asserts that the FTCA discretionary function exception is inapplicable to his complaint, because the BOP regulations and policies mandated a specific course of action, the defendant's staff did not adhere to those regulations and policies, and the decisions it made were not based on considerations of public policy.

Plaintiff denies that his claim against the defendant for negligent decision-making at prior institutions is barred by the statute of limitations; he contends that his claim is pled as a continuing tort, with the last tortious act having been committed on February 14, 2011.

## III. Standard of Review

**A. Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it

does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."

Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion

to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the

complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d

1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the

claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what

the . . . claim is and the grounds upon which it rests.' " Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that

a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," Id. (citations omitted), to one that is "plausible on its face," Id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002) and Iodice v. United States, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

**B.  Motion for Summary Judgment**

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u> at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id.</u> This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u> at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, at 587 (citation omitted).

### IV. <u>Analysis</u>

#### A. <u>Federal Tort Claim Act and West Virginia Law</u>

The FTCA[14] is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow "civil actions . . . for money damages . . . for . . . personal injury . . .

---

[14] The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680.

caused by the negligent or wrongful act or omission of any employee of the Government . . . . under circumstances where . . . a private person . . . would be liable" under applicable state tort law. 28 U.S.C. § 1346(b)(1); Parrott v. United States, 536 F.3d 629, 635 (7th Cir. 2008). Pursuant to the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 2674 and 1346(b)(1); Medina v. United States, 259 F.23d 220, 223 (4th Cir. 2001).

In West Virginia, in every action for damages resulting from injuries to the plaintiff alleged to have been inflicted by the negligence of the defendant, the plaintiff must establish three elements: (1) a duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty. Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W.Va. 1939). The burden is on the plaintiff to prove these elements by a preponderance of the evidence. Id. at 899; see also, Murray v. United States, 215 F.3d 460, 463 (4th Cir. 2000). Therefore, the plaintiff must prove that the "defendant's breach of duty was more likely than not the cause of the injury." Murray at 463 (quoting Hurley v. United States, 923 F.2d 1091, 1094 (4th Cir. 1991); see also, Strahin v. Cleavenger, 603 S.E.2d 197 (W.Va. 2004)(stating that "no action for negligence will lie without a duty broken.").

With respect to federal prisoners, the Supreme Court has determined that the duty of care owed by the BOP is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule. United States v. Munitz, 534 F.2d 53, 53 (1963). Title 18 U.S.C. § 4042 defines the duty of care owed to a prisoner as, " the exercise of ordinary diligence to keep prisoners safe and free from harm." Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976)). However, the BOP's duty towards the protection of

prisoners is not the guarantee of "a risk-free environment." See Usher v. United States, 2010 WL 3721385 (E.D. Ky. Sept. 15, 2010).

In West Virginia, negligence is "always determined by assessing whether the actor exercised 'reasonable care' under the facts and circumstance of the case, with reasonable care being that level of care a person of ordinary prudence would take in like circumstances." Strahin v. Cleavenger, 603 S.E.2d 197, 205 (W.Va. 2004). "A long standing premise of the law of [West Virginia] is that negligence is the violation of the duty of care under the given circumstances. It is not absolute, but is always relative to some circumstances of time, place manner, or person." Setser v. Browning, 590 S.E.2d 697, 701 (W.Va. 2003). Accordingly, the duty of care owed to an inmate under West Virginia law is consistent with Title 1 U.S.C. § 4042.

Although 18 U.S.C. § 4042 sets forth the mandatory duty of care, it does not direct how the duty is fulfilled. See Calderon v. U.S., 123 F.3d 947, 950 (7th Cir. 1997)(finding the statute "sets forth no particular conduct that the BOP personnel should engage in or avoid while fulfilling their duty to protect inmates."). However, under the FTCA, in disputes between prisoners, it is clear that BOP employees could be negligent in their duty to protect prisoners if they "knew or reasonably should have known of a potential problem" between inmates. Parrot, supra at 637. "In FTCA suits brought by inmates alleging assaults by other inmates, a breach of the duty of ordinary care usually requires a showing that correctional officials knew of a potential problem between the two inmates prior to the assault. In other words, there must be knowledge on the part of such officers in charge that such injuries will be inflicted, or good reason to anticipate such, and following that, there must be a showing of negligence on the part of these officials in failing to prevent the injury." Michtavi v. United States, 2009 WL 578535 (M.D.Pa. 2009), quoting Macias v. United States, C.A. No. 05-1445, 2006 WL 1843111 at *2 (D.N.J. June 30, 2006)(citations omitted); see also Turner v. Miller, 679

F.Supp. 441 (M.D.Pa. 1987)(stating "the duty imposed upon a jailer *vis a vis* his prisoner is 'to exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him.").

Here, the United States appears to acknowledge that it owes a "duty" to keep prisoners safe and free from harm. However, it argues that the Plaintiff has failed to establish that it breached that duty and/or that it was the proximate cause of his injuries. It contends that it cannot be liable for the plaintiff's injuries because it did not know of the potential harm the DWB posed to plaintiff, because the plaintiff did not advise FCI Gilmer staff, during his initial intake interview, that he was a member or associate of a gang; said he knew of no reason why he could not be housed in the general population; and when SIS determined it would place him in the general population, did not object.

Plaintiff alleges that the defendant's BOP staff was well aware that he could not be housed with members of his former gang, Dirty White Boys ("DWB"), because

1) he had initial intake interviews with FCI Gilmer's SHU Lieutenant McCullem and a SIS Lieutenant and so advised them. The SIS Lieutenant asked if him if he considered himself "affiliated with or part of the [DWB] . . . gang in any way." When plaintiff stated he no longer was so affiliated, the Lieutenant said "[w]e do not allow Dirty White Boys on this prison compound." After being assured that no DWBs were present and none would ever be allowed in the prison yard, plaintiff willingly went into the general population. (Dkt.# 54-1 at 7 and 65-1, ¶10 at 3).

2) The BOP staff already knew of his history of problems with DWB members because they were privy to his Central File, SENTRY records, CIMS status, transfer packet information from USP Lewisburg and USP McCreary, and were aware he had "covered up" his DWB gang tattoo to avoid being identified by them; and

14

3) the BOP staff knew what a DWB tattoo looked like; what a "covered" DWB tattoo signified (Dkt.# 28-7, ¶13 at 2, Dkt.# 63-2); were well aware of the prison inmate inter-facility communication pipeline's existence by which the DWB's "orders to kill" were transmitted (Dkt.# 65 at 14 – 15 and Dkt.# 65-1, ¶6 at 2); and were aware that the DWBs had a policy of severely injuring or killing former members who tried to disassociate.

After spending approximately one month in FCI Gilmer's general population, plaintiff was temporarily placed in the Special Housing Unit ("SHU") for a disciplinary violation.  In his reply to the defendant's supplemental memorandum in support of its motion to dismiss, the plaintiff contends that in or about mid-January, 2011,[15] upon his release from the SHU, he specifically asked, before being put back into the general population, whether any DWBs were present there, and was again assured that there were none. (Dkt.# 65-1, ¶11 at 3).  Accordingly, he again willingly went back into the general population. On February 14, 2011, after leaving the chow hall after lunch, he was attacked by "Bubba," a DWB gang member, and viciously beaten.

Plaintiff alleges that the BOP staff was negligent, in that they failed to abide by Bureau BOP Program Statement 5290.15, which governs the screening of inmates to ensure that separatees are not housed together by accessing newly-received inmate's SENTRY-generated Intake Screening form, and reviewing or cross-checking against the CIM Clearance and Separatee Data to identify any separatees currently housed in the institution.   He contends that after the DWBs at USP Lewisburg advised him to "check in" to the SHU or be killed in mid-2007, he was thoroughly debriefed by USP Lewisburg's SIS, who ultimately recommended him for transfer, specifically directing that he should be kept separated from DWB gang members permanently, and noting in writing that if he were ever

---

[15] Elsewhere, plaintiff says he was released from the SHU in mid-December, 2010.  (Dkt.# 54-1¶¶ 28 and 30, at 8).

housed with them, that violence would be imminent.[16] (Dkt.# 54-1, ¶10 at 2-3). The Government has not specifically responded to this allegation, except to provide a one-page January 13, 2009 memo "attachment" approved by the Warden at *USP McCreary*, created approximately a year and a half to two years after the USP Lewisburg document plaintiff referenced, documenting an interview with plaintiff after his attack at USP McCreary, creating a CIMS separatee status for a specific inmate (whose name has been redacted), stating:

> An interview was conducted with inmate Usry . . . During the Course [sic] of the interview, Usry stated, "I don't know who or why they hit me. [sic] I used to be a Dirty White Boy but I covered up my tattoo." An interview was conducted with inmate *[redacted inmate assailant's name]* . . . During this interview he admitted to assaulting Usry. Stating [sic] "I punched and kicked him because he would not stay down, he's a piece of shit." *[Redacted inmate assailant's name]* claimed they did time together at USP Lewisburg and the same thing happened there.[17] . . . Recorded video surveillance clearly depicts inmate [redacted inmate assailant's name] striking inmate Ursy. [sic] This investigation concludes the greater weight of the evidence supports a finding a threat exists to Usry's safety and to the orderly running of the institution should he be returned to general population. This conclusion is based on information obtained during the course of this investigation which suggests Usry has underlying issues with inmates who associate with the Security Threat Group Dirty White Boys (DWB). It is opinion [sic] of this investigator due to the fact Usry covered his DWB tattoo it implies he is no longer in good standing with the group. Based on the statements of *[redacted inmate assailant's name]* it is clear a valid threat exists. If Usry was to be placed back into general population he would most likely be harmed. This writer recommends inmate *[redacted inmate assailant's name]* receive an incident report for Code 224 Assault. Based on his admission and injuries sustained by Usry which are consistent with this act. [sic]. Additionally, Usry should receive a CIMS assignment of separation from inmate *[redacted inmate assailant's name]*. Furthermore he is to remain in the Special Housing Unit until he can be transferred to another Bureau of Prisons facility commensurate with his safety and security needs.

(Dkt.# 63-2).

---

[16] Plaintiff avers that he still had a copy of the 2007 USP Lewisburg transfer packet containing the SIS determination of his separatee status from all DWBs when he arrived at FCI Gilmer in mid-August 2010, but it was later lost in a flood in the property room at the facility. (Dkt.# 54-1, ¶11 at 3).

[17] Plaintiff nowhere alleges, and the record is devoid of any mention of an attack on plaintiff while he was at USP Lewisburg.

The defendant's production of this document only shows plaintiff has CIMS separatee status against a specific inmate who attacked him at USP McCreary; it is insufficient to overcome plaintiff's allegations that he had permanent separatee status against all DWBs, based on SIS investigations at USP Lewisburg nearly two years earlier.

The United States admits that: "Bubba" was a DWB; that he was placed in the general population with plaintiff, and that "Bubba" attacked Plaintiff. The undisputed facts establish that the physical assault did not occur until the plaintiff was released back into the general population after being temporarily housed in the SHU.[18] Accordingly, the undersigned is of the opinion that the Plaintiff has set forth a scenario under which a reasonable person would anticipate that inmates such as plaintiff who had disassociated from the DWBs were in danger and FCI Gilmer's staff may have been negligent in preventing the scenario.

The United States also argues that the Plaintiff has failed to present evidence that it was the proximate cause of his injuries. As previously noted, under the FTCA, the law of the state where the alleged negligence occurred controls the analysis. 28 U.S.C. § 2674; Miller v. United States, 932 F.2d 301, 303 (4th Cir. 1991)("State law determines if there is an underlying cause of action"). "West Virginia law defines a proximate cause of an injury as one 'which, in natural and continuous sequence, produces foreseeable injury and without which the injury would not have occurred. Thus, the test requires both (1) foreseeable injury; and (2) but-for causation." Grant Thornton, LLP v. Federal Deposit Ins. Corp., 435 Fed.Appx. 188, 194 (4th Cir. 0211)(internal quotations and citation omitted); Aikens v. Debow, 541 S.E.2d 576, 581 (W.Va. 2000)("To be actionable, negligence must be the proximate cause of the injury complained of and must be such as might have reasonably expected to produce an injury.")(internal citation omitted).

---

[18] It is unclear from the record when "Bubba" was admitted to FCI Gilmer, whether it was while the plaintiff was housed in the SHU from approximately September 2010 to mid-January 2011, or whether it was sometime after he had already been released back into the general population.

The Plaintiff alleges that FCI Gilmer's staff was the proximate cause of his injuries. More specifically, he alleges that had FCI Gilmer's staff properly performed initial intake screenings on "Bubba" and himself, "Bubba" would not have gained entry into FCI Gilmer's general population while plaintiff was there.

In response, the United States contends that an SIS recommendation that plaintiff not be placed in general population of one institution does not mean he could not be housed in the general population of another, and just because plaintiff had problems with some DWB members at prior facilities "does not mean he will have the same problems at a Federal Correctional Institution in West Virginia." (Dkt.# 63-1 at 1) This is speculative, at best, and certainly does not provide an adequate basis for dismissing the plaintiff's complaint at this time.[19]

The United States also challenges the plaintiff's claim that FCI Gilmer's staff was the proximate cause of his injuries by asserting that "Bubba's" criminal and illegal assault on plaintiff, operating independently of any other act, made it the proximate cause of his injury. The United States continues this argument by stating that the intervening cause, "Bubba's" assault, severed any causal connection between the alleged improper action of allowing "Bubba" into FCI Gilmer's general population and the Plaintiff's damages. However, "[a]n intervening cause, in order to relieve a person charged with negligence in connection with an injury, must be a negligent act, or omission, which constitutes a new effective cause and operates independently of any other act, **making it and it only**, the proximate cause of the injury." Harbaugh v. Coffinbarger, 543 S.E.2d 338, 345 (W.Va. 2000)(internal quotation omitted)(emphasis added). Therefore, the two acts of negligence must be unconnected and unrelated, i.e., the one cannot be

---

[19] Moreover, this is inconsistent with the defendant's stated position at the May 3, 2012 *ex parte* hearing on its Motion to Serve by Unconventional Means, when it argued that the plaintiff should not be permitted to keep copies of his own case pleadings, because he could be in danger from other inmates at FCI Butner 2, if his DWB gang status and DWB allegations became known there. The defendant, through counsel, stated that inmates are very good at 'ferreting out' information. (Dkt.# 60 at 14 – 15).

foreseen to be the result of the other." <u>See</u> <u>Grant Thornton</u>, *supra* at 198. Here, assuming the FCI Gilmer staff was negligent, it seems foreseeable that the plaintiff, faced with a DWB member who was armed with a metal pipe, would be attacked.

Finally, the United States argues that in a negligence action, any "willful, malicious, or criminal act breaks the chain of causation." <u>Yourtee v. Hubbard</u>, 474 S.E.2d 613, 620 (W.Va. 1996). The United States maintains there exists an additional intervening cause – the willful and malicious striking of the plaintiff by "Bubba." However, <u>Yourtee</u> actually holds that such acts do not necessarily break the chain of causation:

> A tortfeasor whose negligence is a substantial factor in bringing about injuries is not relieved from liability by the intervening acts of third persons if those acts were reasonably foreseeable by the original tortfeasor at the time of his negligent conduct.

<u>Yourtree</u> at 621.

Again, it is not clearly unforeseeable that a DWB inmate, armed with a metal pipe, or even his own feet, would use them to harm another inmate who had disassociated with the DWBs. Therefore, if the FCI Gilmer staff was negligent in performing its screening duties, thus allowing "Bubba" to enter the general population to attack plaintiff, the actions of "Bubba" would not relieve them from liability for the Plaintiff's injuries.

**B.  <u>Discretionary Function Exception to the FTCA</u>**

The Government argues that although the FTCA waives sovereign immunity to allow tort claims against it, the discretionary function exception to the FTCA bars Plaintiff's claims.  It correctly notes that "[w]hether . . . [it] was in fact negligent is irrelevant to the analysis." <u>See</u> <u>Hylin v. United States</u>, 755 F.2d 551, 553 (7th Cir. 1985). The FTCA's discretionary function exception applies to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government,

whether or not the discretion involved be abused." 28 U.S.C.A. § 2680. The exception serves to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Palay v. United States, 349 F.3d 418, 427 (7th Cir. 2003) (*quoting* United States v. Gaubert, 499 U.S. 315, 323 (1991)).

Two factors must be present for the exception to apply: "(1) the action complained of must involve an element of judgment or choice; and (2) the action must relate to considerations of public policy." Bailor v. Salvation Army, 51 F.3d 678, 685 (7th Cir. 1995) (citing Gaubert, 499 U.S. at 322-23); Berkovitz v. United States, 486 U.S. 531, 536-37 (1988)).

With respect to the judgment or choice prong, so long as the action or inaction that is the subject of the FTCA claim involves an element of discretion, this prong is satisfied, even if the Government employee's decision was an abuse of discretion. Palay v. U.S., 349 F.3d at 428; *Bailor*, 51 F.3d at 685. However, "[i]f 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' the discretionary function exception does not apply." Calderon v. U.S., 123 F.3d 947, 949 (7th Cir. 1997) (*quoting* Gaubert, 499 U.S. at 322). The failure to follow a specific rule, mandate, or order constitutes an absence of discretion, as opposed to an abuse of discretion. See Gaubert, 499 U.S. at 322-24. Thus, even when a more general decision may be discretionary, such as whether to keep two inmates separated, if "a valid separation order is in effect, there is no discretion left to operate on that narrow question." Parrott, *supra* at 638.

With respect to the public policy prong, the decision that is the subject of the FTCA claim must involve a policy concern. The exception, however, is not limited to the decisions by those in "policymaking or planning ranks of government," but also applies to the day-to-day decisions when carrying out such policies. Palay, 349 F.3d at 428. "It is the nature of the conduct, rather than status of the actor, that governs whether the discretionary function applies in a given case." Palay, 349 F.3d

20

at 428. "When established government policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Id. (*quoting* Gaubert, 499 U.S. at 324). Thus, the second prong of the discretionary function exception applies not only to the promulgation of Bureau of Prisons . . . rules and regulations enacted by policymakers, but also to the discretionary decisions of officers when carrying out such rules. Id.

Before a court engages in the two-part inquiry to determine if the discretionary function exception bars a suit based upon Government conduct, "[the court] must identify the conduct at issue." Merando v. United States, 517 F.3d 160, 165 (3rd Cir. 2008). In the instant case, the Government identifies the challenged conduct as "[Bubba's] placement in general population," or, alternatively, "plaintiff's placement in the general population." (Dkt.# 28-2 at 11).

The issue as presented is, whether the defendant had a non-discretionary duty to perform a CIM Clearance and Separatee Data and SENTRY check of plaintiff, or alternatively, of "Bubba," before placing them together in the general population. See BOP PS 5290.15 and 5180.05.

The Government states that the placement of inmates within a facility is left to the discretion of BOP officials. In support of this contention, the Government cites 28 C.F.R. § 541.22(a) and a number of cases from various jurisdictions: Brown v. United States, 596 F.Supp. 2d 596 (W.D. Va. July 30, 2008) (a prison official's decision regarding whether to place an inmate in the general population falls within the discretionary function exception); Fargas v. United States, 2008 WL 698487 *9 (D. Minn. March 13, 2008)(prison official's decision to cell  plaintiff inmate with an assaultive inmate who attacked him protected by the discretionary function exception); (Cohen v. United States, 151 F.3d 1338 (11th Cir. 1998)(discretionary function exception applied where the plaintiff alleged he was assaulted by an inmate the BOP misclassified, wrongly transferred and

placed at facility); <u>Dykstra v. United States Bureau of Prisons</u>, 140 F.3d 791 (8th Cir. 1998)(discretionary function exception applied to prison officials' failure to warn plaintiff, who was later sexually assaulted, that his youthful appearance might make him vulnerable to sexual assault and failure to place him in protective custody upon his complaint that a fellow inmate was staring at him); <u>Calderon v. United States</u>, 123 F.3d 947 (7th Cir. 1997)(discretionary function exception applied to prisoner's FTCA claim for government's negligent failure to prevent his cellmate's attack on him); <u>Buchanan v. United States</u>, 915 F.2d 969 (5th Cir. 1997)(discretionary function exception applied to prisoner's FTCA claim for damages sustained while prisoners were held hostage by Cuban detainees during prison uprising); <u>Michtavi v. United States</u>, No. 4:07cv0628, 2009 WL 578535 (M.D. PA. March 9, 2009)("Courts within this circuit and others have uniformly held that federal prisoners' FTCA claims for injuries by fellow inmates are barred by the discretionary function exception")(internal citations omitted); and <u>Zastoupil v. United States</u>, 7:08cv00332, 2009 WL 145521 (W.D. Va. Jan. 20, 2009)(prison official's decision to place inmate in same housing unit with assailant with a history of attacking other inmates was a discretionary decision advancing the purpose of a regulatory scheme).

Neither § 541.22(a) nor the Government's citations to <u>Brown</u>, <u>Fargas</u>, <u>Cohen</u>, <u>Dykstra</u>, <u>Calderon</u>, <u>Buchanan</u>, <u>Michtavi</u> or <u>Zastoupil</u>, *supra* assist with determining whether Bubba's (or plaintiff's) placement in general population was discretionary. The United States argues that the only mandatory duty the FCI Gilmer interviewer had was to determine whether plaintiff had any separatees at the prison when he arrived, and "this was done and it was determined that Plaintiff had no separatees" at FCI Gilmer. In its memorandum of law in support of its motion to dismiss, the United States contends that the same was true for "Bubba," (Dkt.# 28-2 at 13), because neither "Bubba" nor plaintiff were separatees before the February 14, 2011 assault. In making this argument,

the United States first cites <u>Brown v. United States</u>, 569 F.Supp. 2d 596, 600 (W.D.Va. July 30, 2008). That case is not dispositive because it is not binding precedent; nor are the facts in <u>Brown</u> consistent with those in the record here. In <u>Brown</u>, there was no allegation of CIMS separatee status or a transfer package from a prior BOP facility, specifically warning of a lethal threat if he were housed with members of a particular gang, as plaintiff contends that he has.[20] All of the cases[21] the

---

[20] Moreover, the undersigned does not believe that liability in this case is dependent upon whether members of FCI Gilmer staff received an actual or particularized notice of danger to the plaintiff. The plaintiff is not alleging a constitutional tort, requiring him to show deliberate indifference, and therefore, actual notice of the danger to him. Because the FTCA renders the United States liable for negligently failing to protect a prisoner, negligence, in the opinion of the undersigned, includes failure to respond to a risk which a reasonable person would have known, whether or not he or she was actually apprised of it. See <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994)(an 8th Amendment claim for deliberate indifference requires actual notice; <u>Del Raine v. Williford</u>, 32 F.3d 1024, 1032 (7th Cir. 1994)(comparing constitutional and negligence standards).

[21] Brown, previously assaulted by gang members at two prior facilities, told correctional officers during intake interview at new facility about the prior assaults; because he had no named "separatees" at the new facility, and could not identify any specific inmate from whom he needed separated, he was placed into general population and was attacked again by members of the same gang. However, Brown's complaint made no claim that the BOP had violated any mandatory duty, which could have shielded his claim from the discretionary function exception, and there was nothing in the record regarding a specific finding by a prior prison official to the extent that he should not be housed with a member or members of the gang. In <u>Fargas</u>, the plaintiff was moved into a cell with another inmate he alleged he warned correctional officers he would be at risk with, because the other inmate was a dangerous gang member; the prospective cellmate also warned he would react violently if given a cellmate; after initially placing Fargas in the cell, upon the other inmate's immediate verbal attack toward Fargas, the guard told Fargas to "cuff up" in order to be moved back out of the cell; as soon as Fargas was cuffed, the other inmate attacked, and the guard immediately removed him from the cell. There was nothing in the record to support an inference of prior BOP knowledge of a documented risk from the inmate, and there was a question in the record of whether Fargas may have been the one who initiated the verbal altercation. In <u>Cohen</u>, the plaintiff inmate suffered severe neurological injuries from another inmate's attack; nothing in the record supported any inference of prior BOP knowledge that the assailant might attack. In <u>Dykstra</u>, the youthful-looking plaintiff inmate was sexually assaulted by an inmate from whom he had had no prior threat, other than the inmate "staring at" him. In <u>Calderon</u>, the plaintiff inmate "snitched" on a relative of his cellmate; his cellmate learned of it and threatened and extorted money from him several times. Fearing more, Calderon told several BOP officials who took no steps to protect him or to discipline the cellmate, who later attacked him, causing serious injury. Calderon presented no evidence that BOP personnel witnessed any violation of prison regulations or made any formal finding that his assailant had actually committed any of the prohibited acts prior to his attack. Thus, the BOP's decision not to separate the two was found to be discretionary. In <u>Buchanan</u>, the court found that prison officials' minute-to-minute decision making in the chaotic circumstances of a sudden prison riot was a classic example of an activity requiring the exercise of discretion. However, unlike this case, there was no prior knowledge of a long-standing specific threat to the plaintiff; instead, the BOP had little warning of an imminent threat of a wholesale riot, where it temporarily lost control of the prison to a group of 1,200 Cuban detainees, who physically and psychologically abused the plaintiff and approximately 36 other hostages it took from 70 American inmates and staff. In <u>Michtavi</u>, an inmate's FTCA property loss and emotional distress claims that BOP officials were negligent for failing to prevent fellow inmates from scamming him were dismissed. He failed to allege that BOP had any prior knowledge or reason to anticipate the other inmates' actions, or that the BOP officials had any reasonable opportunity to prevent the harm. Although the plaintiff's FTCA claims were also barred by the discretionary function exception, his claims were also dismissed because punitive damages, recovery for property losses, and injunctive relief are not available under the FTCA, nor are compensatory damages for mental or emotional injuries without physical injury. Further, he failed to establish either negligence or intentional infliction of emotional distress by any BOP official. In <u>Zastoupil</u>, the plaintiff, convicted of sex crimes involving children, was attacked by a cell mate that he had never had a

Government relies on are distinguishable from the case at bar because here, plaintiff had a well-documented BOP history of threats of death and life-threatening beatings by the DWBs, a national prison gang known to reliably react with lethal force against former members, along with, as he alleges, a CIMS status or documentation in his SENTRY records which may have specified that he had a permanent separatee status with all DWB gang members. In short, nothing in the record of any the cases cited by the Government supports an inference that the specific danger of those inmate attacks were known, or reasonably should have been known and foreseeable to BOP officials, and documented in a prisoner's Central File, as here. Moreover, §541.22(a) merely states that a BOP warden or lieutenant "may" place an inmate in administrative detention under certain circumstances, including if the inmate is a new commitment awaiting classification or if the inmate's continued presence in general population poses a threat of safety to the inmate or others, or he is awaiting either a disciplinary hearing or investigation. This section applies more to the disciplining of inmates as opposed to the procedures with the placement of inmates in general population upon their entrance into a particular facility or unit.

Here, the challenged conduct – the placement of plaintiff or inmate "Bubba" in general population – appears to involve issues with respect to intake procedures. Plaintiff alleges that FCI Gilmer staff knew or should have known that "Bubba" posed a potentially lethal threat to him, yet still placed "Bubba" in general population and then released plaintiff from the SHU to join "Bubba" there.

In his response to the Government's supplemental memorandum of law to its motion to dismiss, Plaintiff gives a detailed history and explanation of the DWBs' culture, explaining that as a former longtime DWB himself, he is uniquely familiar with how the DWBs operate throughout BOP

problem with, felt threatened by or been assaulted by before; nor had the plaintiff previously voiced any concerns to BOP officials of an identifiable risk to his safety.

facilities (Dkt.# 65-1,¶ 12 at 2 - 3); that "Bubba" was a member of the DWBs, a national prison gang "whose goals transcend [BOP] institutional lines" (Dkt.# 64-2 at 14); the DWBs' signature tattoo represents sworn commitment to lifelong membership; an inmate who later reneges on the vows or covers up the DWB tattoo with another is marked for murder upon sight by any other DWB (Dkt.# 65-1 ¶5 at 2); that a DWB who refuses a DWB order to kill another inmate will himself be marked for murder (Dkt.# 64-2 at 15); that for the past 15 years, in an effort to control, contain and curtail BOP violence perpetrated by the DWBs, the BOP has been corralling all DWBs at certain prisons, including, especially USP Tucson (Dkt.# 54-1, ¶14 at 3, #64-2 at 15 and #65-1, ¶9 at 3); that there is a "swift and certain" DWB communication system between BOP facilities, such that a prisoner who is marked for murder at one institution cannot escape attack by "simply going to another institution," because he will be hunted down by DWBs, acting on "orders to kill" from the prior facility at any subsequent one (Dkt.# 65 at 14 – 15 and 65-1, ¶6 at 2); that the BOP is well aware of the *de facto* inmate inter-facility communication system (Dkt.# 65 at 15, Dkt.# 65-1, ¶6 at 2);  that the SIS at USP Lewisburg placed a memorandum in his Central File effectuating permanent separate status from all DWBs that must be "treated as binding at the transferee institution" (Dkt.# 65-1,  ¶12 at 4); plaintiff was "chased off the prison yard" into protective custody by DWBs at USP Lewisburg (Dkt.# 65-1, ¶6 at 2); after transfer from Lewisburg and several holdover facilities, plaintiff was initially designated to go to USP Tucson, a designation later rescinded because of USP Tucson's large DWB population (Dkt.# 54-1, ¶14 at 3); plaintiff was instead transferred to USP McCreary and placed in the general population where he was immediately attacked and nearly killed by DWBs (Dkt.# 54-1, ¶14 at 4); and the only reason he was not attacked at FMC Springfield was because FMC Springfield kept him completely segregated from all other inmates, even during physical therapy sessions. (Dkt.# 54-2, ¶24 at 6).  Plaintiff contends that the Warden at FMC Springfield told plaintiff he could not return to

USP McCreary "because of the state of [his] . . . [BOP] record, SENTRY, and CIMS." (Dkt.# 65-1, ¶7 at 2 -3).[22]

Plaintiff avers that FCI Gilmer knew of the DWB's propensity for violence against former members and was aware, based on information in his Central File, that plaintiff, as a former member of the DWBs had been nearly beaten to death by the DWBs for leaving the group; that FCI Gilmer staff had access to his transfer packet from USP Lewisburg SIS that specified the necessity of plaintiff's separation from all DWBs, effectuating a "permanent separatee status" *vis a vis* plaintiff and DWB gang members (Dkt.# 54-1, ¶10 at 2-3); that during his FCI Gilmer intake interview, the only reason plaintiff was agreeable to placement in general population was because he was assured that there were no DWBs there and that "no DWBs were allowed" there (Dkt.# 65 at 15);  that despite those assurances, "Bubba" was admitted to the general population while plaintiff was in the SHU; that "Bubba" was acting on orders from the USP Lewisburg DWBs to kill him, and that "Bubba" did try to kill him.  (Id., ¶11 at 3).  The plaintiff correctly points out that the BOP's own policy[23] of forbidding a CIMS case inmates from having access to the actual names and identities of their own separatees works to inmates' detriment, because inmates are forced to rely on the BOP's consistent execution of its own mandatory policies to keep them safe, and are left unprotected if the BOP staff does not do so.

Although silent as to plaintiff's allegation regarding what his 2007 USP Lewisburg transfer documentation contained, the defendant does admit that plaintiff's "closer supervision transfer documentation" from USP McCreary

---

[22] Ultimately, on March 10, 2010, plaintiff was sent back to USP McCreary after FMC Springfield finished treating his injuries from the October 31, 2008 attack.  However, he was kept segregated in protective custody in the SHU, until he was finally transferred away from USP McCreary. (Dkt.# 28-6 at 18).

[23] BOP Program Statement 5180.05(8)(b) requires that an inmate be notified in writing of a CIMS assignment, but explicitly precludes prison staff from including the names of those from whom the inmate is to be separated.

revealed that he was recommended for transfer from his last institution because he had been assaulted at USP McCreary in 2008. . . . [and] that . . . [he] had stayed in SHU after the assault at USP McCreary until after he was transferred to another facility . . . The transfer documentation indicates that the SIS Department at USP McCreary wanted to return plaintiff to the general population, but found that there were inmates in the general population at that institution who were aware of Plaintiff's previous association with the DWB and inmates who were associates of the specific inmates who had assaulted him in 2008.  As such, it was recommended that Plaintiff be transferred to another institution.

(Dkt.# 28-2 at 4-5).

Although the assignment of a housing unit or classification for an inmate may be discretionary, the Government cites no regulation, rule, or policy statement demonstrating that such an assignment is discretionary. Furthermore, BOP Program Statements 5290.15 and 5180.05 provide certain mandatory procedures with the classification and housing of inmates.[24]  While the ultimate

---

[24] 1. [PURPOSE AND SCOPE §522.20.  Bureau of Prisons staff screen newly arrived inmates to ensure that Bureau health, safety and security standards are met.]  **When an inmate is received, as a new commitment, in transfer from another institution,** as a court return, as a return from a writ, or as a holdover, **it is possible that information regarding that inmate is inaccurate, incomplete, or unavailable during the pre-arrival screening process.  Therefore, before placing that inmate in the institutions' general population, staff shall ensure that health, safety, and security standards delineated in this Program Statement are met.  Social and medical screening interviews are required to meet these standards**.

7 [PROCEDURES §522.21 a.  Except for such camps and other satellite facilities where segregating a newly arrived inmate in detention is not feasible, **the Warden shall ensure that newly arrived inmate is cleared by the Medical Department and provided a social interview by staff before assignment to the general population**.]  **Staff shall observe the physical appearance of the inmate and interview each inmate prior to placement in the general population.  If this is not possible, inmates are to be kept in detention until completion of the medical clearance and social interview.**  Each institution shall develop procedures for processing commitments after regular working hours.

. . .

[(1)] **Immediately upon an inmate's arrival, staff shall interview the inmate to determine if there are non-medical reasons for housing the inmate away from the general population. Staff shall evaluate both the general physical appearance and emotional condition of the inmate**.

The social interview is to be conducted in private (no other inmates in area) by a Unit Manager, Correctional Counselor, Case Manager, or other staff the Warden designates who have been trained in intake screening . . .

The interviewer shall also review SENTRY information and the Inmate Central File or Presentence Investigation Report . . . if available, and make a decision whether the inmate is suitable for placement in general population.

. . .

[(3)] Staff shall placed recorded results of the intake medical screening and the social interview in the inmate's central file.

determination where to place an inmate may be discretionary, the procedures that must be followed

before making that decision are not. See Palay, 349 F.3d at 429 (although the assignment of inmates

---

The social interview is documented on the Intake Screening Form, which shall be retrieved from SENTRY upon the inmates immediate arrival at the institution, to ensure the most current CIM Clearance and Separatee Data Form is attached for the interview process.

  Retrieval of this information prior to the inmate's immediate arrival may result in outdated or even inaccurate information.

  The completed Intake Screening Form shall be maintained with all previous Intake Screening Forms in section 3 of the Inmate Central File.

. . .

Staff shall place particular emphasis on the Central Inmate Monitoring status of the holdover, since, ordinarily, an inmate may not be transported with or confined with inmates from whom he or she is to be separated.

To ensure that separatees are not housed together, staff shall access the newly received inmate's SENTRY-generated Intake Screening Form and thoroughly review the CIM Clearance and Separatee Data to identify any separatees currently housed in the institution.  Staff may also cross-check the names of separatees with an alphabetical list of all inmates in the institution.

P.S. 5290.15(1) (emphasis added).

  Policy Statement 5180.05, Central Inmate Monitoring System, which Plaintiff cites, provides in pertinent part:

1. [PURPOSE AND SCOPE §524.70. The Bureau of Prisons monitors and controls the transfer, temporary release . . . and community activities of certain inmates who present special needs for management. Such inmates, known as central inmate monitoring (CIM) cases, require a higher level of review which may include Central Office and/or Regional Office clearance for transfers, temporary releases, or community activities. This monitoring is . . . to provide protection to all concerned and to contribute to the safe and orderly operation of federal institutions.
    . . .

d. **Disruptive Group. Inmates who belong to or are closely affiliated with groups (e.g., prison gangs), which have a history of disrupting operations and security in either state or federal penal** (which includes correctional and detention facilities) institutions. **This assignment also includes those persons who may require separation from a specific disruptive group**.

f. **Separation.  Inmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the separatees) with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future.**  Factors to consider in classifying an individual to this assignment include, but are not limited to, testimony provided by or about an individual . . . and whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals, either in the community or within the institution . . . This assignment may also include inmates from whom there is no identifiable threat, but who are to be separated from others at the request of the Federal Judiciary or U.S. Attorneys.

P.S. 5180.05(d); see also Palay, 349 F.3d at 431 n.7 (discussion of mandatory intake procedures).

to a particular unit may be discretionary, the failure to follow more specific, mandatory rules with respect to making that decision is not covered under the discretionary function exception).

In response to plaintiff's allegation that the defendant violated its mandatory duty to keep "Bubba," a member of a CIMS Disruptive Group, segregated from the general population, the United States, without support, denies that the DWBs are a Disruptive Group, contending that: DWBs, along with many other gangs, are merely one of "hundreds" of Security Threat Groups in the BOP; Security Threat Groups are not given a special CIM assignment; and therefore, no mandatory duty to protect plaintiff from them arose. (Dkt.# 63-3, ¶5-7 at 1). The United States asserts that inmates who leave Security Threat Groups are not kept separated from every other member or associate of the group, only with specific inmates with whom they have a specific problem. (Dkt.# 63-3, ¶8 at 2). Further, it avers, again without support, that plaintiff was not a separatee of all members or associates of the DWB (Dkt.# 63-3, ¶9 at 2), and that "[m]embers of a disruptive group would not likely be sent to a FCI, rather, they would be sent to a United States Penitentiary based upon their classification." (Dkt.# 63-1, ¶9 at 2).

The undersigned cannot make a determination at this stage, whether the DWB are or are not a Disruptive Group, enabling the plaintiff to avoid the jurisdictional bar of the discretionary function exception on that point. A more fully developed record – one which includes not only an explanation of which Security Threat Groups comprise the subgroup of Disruptive Groups within the BOP, including evidence establishing that the decision to place plaintiff, or alternatively, Bubba, in general population was discretionary after mandatory procedures were followed – may demonstrate that the discretionary function applies here. Such a determination cannot be made on the current record.[25]

---

[25] Plaintiff alleges that the BOP only designates the Aryan Brotherhood and the Black Panthers as Disruptive Groups, noting that this "antiquated practice" is disingenuous, because by avoiding such a designation, the BOP can evade the extra precaution of the requisite CIMS classification that would require them to house such inmates in a high security level institution. (Dkt.# 65 at 12). Preliminary research into the issue indicates that the BOP has identified a designated

The Sixth Circuit, in an FTCA fatal inmate assault, held that "[a]s a general principle, a complaint that alleges the existence of a specific and immediate threat against an inmate is more likely to survive a motion to dismiss than a complaint that either alleges a nonspecific threat or provides only conclusory statements regarding the existence of a threat" because "decisions by prison officials to ignore specific and immediate threats against inmates are less likely to be the type of decision that can be said to be grounded in the underlying policy of the BOP, which requires prison officials to provide for the safekeeping and protection of inmates." Montez v. United States, 359 F.3d 392, 398 (6th Cir. 2004). This is consistent with the Seventh Circuit's opinion in Parrott, *supra*, another FTCA inmate on inmate assault case, where it was held that an inmate "must show only that BOP staff knew or reasonably should have known of a potential problem between the two inmates." Parrott, 536 F.3d at 637.

Here, plaintiff's complaint clearly alleges repeated inquiries of BOP officials as to whether any DWB had been admitted into the general population and repeated assurances by the BOP officials that none were or would ever be. It can hardly be said that 18 U.S.C. §4042's policy goal of protecting federal prisoners' health, safety, and security and ensuring the orderly running of the institution was achieved by the BOP's decision to place both plaintiff and "Bubba" together in the FCI Gilmer general population.

---

subgroup within the BOP's Security Threat Groups ("STG"), referred to as "Disruptive Groups," possibly comprised of between 5-7 gangs, including but not limited to Mexican Mafia and Mexikanemi. The BOP describes Disruptive groups as "extremely difficult to manage," and involved in "very bad things," such as contract killing, assaults on inmates and staff, running drugs, and prostitution." See Pl.'s Statement of Material Facts as to Which there is No Genuine Issue at 62-3, Montemayor v. Federal Bureau of Prisons, No.1:02cv10283 (D.D.C. Feb. 16, 2005). A "Validated Disruptive Group Member . . . [is] an STG member who has been formally confirmed as a member of a certified Disruptive Group. **Ordinarily, inmates who attempt to "drop out" of Disruptive Groups, particularly groups with "blood in – blood out" membership rules, shall continue to be tracked [by the BOP] as members; i.e., once a member, always a member**. See BOP Program Statement 1380.03, Security Threat Groups (Limited Official Use Only; Not to be Reproduced) at 62-7, Montemayor v. Federal Bureau of Prisons, No. 02cv10283 (D.D.C. Feb. 16, 2005)(emphasis added). See also Report and Recommendation at 93, Moles v. Lappin, No. CIV-08-594-F (W.D. Okla. 2009)(the Dirty White Boys may be related to the white supremacy gang Aryan Brotherhood).

In Green v. United States, 630 F.3d 1245, the Ninth Circuit Court of Appeals reversed and remanded the decision of the District Court for the District of Arizona which held that the discretionary function exception applied to protect the U.S. Forest Service's decision to light a "backfire"[26] to control a forest fire.[27] Agreeing with the plaintiff/appellants that while the U.S. Forest Service had discretion in how it chose to fight fires, the Ninth Circuit Court of Appeals held that the Government's decision not to warn the plaintiff appellants of its decision to light the backfire was not susceptible to a public policy analysis. Had the Government fairly warned the plaintiff/appellant property owners, "they might have been able to take measure to protect their properties, or at least ensured the Forest Service took measures to do so." Green, supra at 1252. Where the government creates a danger, it must warn the public of that danger. To hold otherwise would unfairly allocate "the entire burden" of government-created dangers to the individual, "leav[ing] him destitute or grievously harmed," and directly contravene the FTCA's liberal purposes. Rayonier Inc. v. United States, 352 U.S. 315, 320 (1957). Similarly, here, while the Government has discretion generally to decide where to house inmates, its failure to warn an inmate with a known, potentially lethal risk, allegedly documented within its own records as a CIMS separatee status or a Disruptive Group, may not susceptible to the public policy analysis set forth in 18 U.S.C. § 4042(2).

Despite the fact that the initial response to plaintiff's administrative grievance was that

investigation into the assault revealed staff did not have any prior information that could have prevented assault. As there is no evidence that any act or omission of a government employee was a factor in your injury, your claim is denied[,]

---

[26] A "backfire" is a fire set along the inner edge of a fireline to consume the potential fuel in the path of a wildfire, or to change the direction of force of a fire's convection column.

[27] The Forest Service set containment boundaries for the fire and posted them for its firefighters to see; the boundaries were intended to protect all the nearby private properties, businesses and Special Risk areas. The backfire was set by U.S. Forest Service's firefighter employees, who took no action to protect the plaintiff/appellants' properties, and it rapidly exceeded its intended containment area, completely consuming the plaintiff/appellants' adjacent properties.

(Dkt.# 1-3 at 1), the undersigned finds that the defendant did have prior information that could have prevented the February 14, 2011 assault.  Moreover, the defendant has admitted it.[28] Additionally, during the May 3, 2012 *ex parte* hearing on defendants' Motion to Serve by Unconventional Means, counsel for defendant further asserted that

> **[o]ne of the things that prompted us to do this** [seek to file by unconventional means] **was a proceeding that -- again, it's our perception, lack of judgment on Mr. Usry's part with respect to his former gang affiliation.**  When he came into FCI Gilmer -- and, of course, this is part of our defense in this case, but I think it also goes to the issue here today.  **When he came into FCI Gilmer, he indicated to intake staff that there was -- he had no reason that he could think of why he shouldn't be put in general population. And he denied gang affiliation.**  And then when he was assaulted at FCI Gilmer, he refused to cooperate with the investigation and denied that it could have been gang related**. That gave us concerns that this gentleman doesn't understand a word -- at least being cavalier with respect to the danger that he is in if the general population at FCI Butner 2 learns that he's a Dirty White Boy and access to papers -- inmates are just experts at ferreting out intelligence.**

(Dkt.# 60 at 14 – 15)(emphasis added).

Clearly, the defendant is and was well aware not only of the lethal tendencies of the DWBs, but also of the deadly efficiency of the prison inmate "information pipeline" that plaintiff avers exists, that the DWBs use to send their "orders to kill" messages from one facility to another, to effectuate retribution against former members. If the defendant did not reasonably believe plaintiff was in danger from the DWB or its associates in the BOP, there would have been no need for it to have had repeated SIS investigations into the issue, to document those finding in his Central File and SENTRY records, or seek to file by unconventional means in these proceedings. Defendant's

---

[28] See FN 5, page 4 - 5, *supra*, regarding 2007 SIS investigation at USP Lewisburg, (Dkt.# 54-1 at 2-3).  See also January 13, 2009 SIS Investigative Report, Dkt.# 54-1 at 5-6; May 14, 2010 BOP Request for Transfer,  Dkt.# 28-6 at 18); Declaration of Timothy Tompkins, the former FCI Gilmer Correctional Officer, Dkt.# 28-5 at 3; and  Declaration of Jorge Giraldo, SIS Lieutenant at FCI Gilmer, attached to the defendant's Memorandum of Law in Support of Defendant's Motion to Dismiss, admits that Giraldo already knew that the February 14, 2011 assault was gang-related before Usry identified his assailant, and that Usry was a former member of the DWB gang who had covered up his tattoos, and what the significance of  a covered DWB tattoo was.  (Dkt.# 28-7, ¶ 12-13  at 2).

contention that plaintiff "refused to cooperate"[29] with the SIS investigation into the FCI Gilmer assault is irrelevant and self-serving.[30] During the post-assault SIS investigation, SIS told plaintiff it was gang-related and demanded that plaintiff identify his assailant, saying "[y]ou know you are gang affiliated . . . [w]e know who hit you and want you to tell us." (Dkt.# 54-1 at 9). When asked who "Bubba" was, plaintiff reports that he could not recall "Bubba's" given name, but that "I told the truth. I could not remember what happened after I saw Bubba removing the object from his clothing.[31] The staff referred to the inmate as "Bubba," and I knew about him from another prison." (Dkt.# 54-2 at 8).

The United States contends that the acts of the BOP employees who decided that the plaintiff and "Bubba," were appropriately housed together are the types of acts that are protected by the discretionary function exception to the FTCA. The plaintiff, conversely, argues that BOP Program Statement 5290.15 and 5180.05 and the CIM Operations Manual designated "Limited Official Use Only, mandate official duties that are absolute, certain, imperative and ministerial, thereby making the action of placing him in the prison's general population with any DWB gang member a non-discretionary function.

---

[29] In the Declaration of Jorge Giraldo, SIS Lieutenant at FCI Gilmer, attached to the defendant's Memorandum of Law in Support of Defendant's Motion to Dismiss, Giraldo states "Inmate Usry did not indicate who the assailant was until after I told . . . [him] I already knew who it was. It was only then that inmate Usry identified the assailant . . . Usry did note that he had been a member of the DWB gang, but had covered up his tattoos, meaning he did not want to be in the gang any longer. The assailant refused to give any statement regarding the assault. I do believe the assault was gang related." (Dkt.# 28-7, ¶ 12-13 at 2). The undersigned notes that even without verbal confirmation from plaintiff that the assault was gang-related, Mr. Giraldo only needed to look at "Bubba's" and plaintiff's Central File and SENTRY records to know of the DWB link between the two. One could infer from Girlado's summary that "Bubba" refused to talk because as a current loyal DWB member, he knew the penalty for "snitches," while the plaintiff, who no longer viewed himself as a DWB member, and had taken great pains, literally and figuratively, to disassociate with the group, did willingly provide what information he could about the assault.

[30] Plaintiff is probably only too well aware of the danger of being a "snitch," especially regarding the DWBs. Given the BOP's dismal record in protecting him from the DWBs in the past, his alleged lack of cooperation would have been understandable. However, plaintiff denies refusing to cooperate with the investigation.

[31] Plaintiff avers that when he saw Bubba approaching, "attempting to conceal himself behind another very large inmate," pulling "a large object out of his pants," he "cut across the sidewalk and became dizzy," and remembers nothing more, waking up later, face down in blood. (Dkt.# 54-1 at 9 and 54-2 at 7).

A careful review of PS 5290.15, "Intake Screening," indicates that its provisions arguably apply to the plaintiff's case. Defendants aver that the SIS staff made no written notation of the August 18, 2010 FCI Gilmer SIS interview, in which plaintiff contends he was repeatedly assured that no DWBs were or would ever be admitted to the general population, because SIS only makes a written note when an inmate notifies SIS that he has issue with being in the general population or the SIS believes that he will. (Dkt.# 28-2 at 3). Defendant instead relies on the BOP's August 17, 2010 Intake Screening Form in support of its position that plaintiff failed to warn them of any potential risk to his safety from the DWBs. (Dkt.# 28-6 at 17). According to check marks placed on the form by the intake officer, plaintiff responded "no" when asked if he knew of any reason that he should not be placed in general population; if he had assisted law enforcement in any way; and if he had ever testified against anyone in court. Defendants also rely on the fact that Plaintiff did not report any concerns to prison officials about his safety, prior to the February 14, 2011 assault. The defendant has already admitted its own "closer supervision transfer" documentation, CIMS, Central File and SENTRY records on plaintiff are replete with references to plaintiff's history of assault and his prior DWB association former gang affiliation. Further, as previously noted, the plaintiff disputes the accuracy of the defendant's version of the August 17 and 18, 2010 interviews,[32] and the responses as reflected on the form and, therefore, the form may not be relied upon by this Court in ruling on Defendants' 12(b)(6) motion. In addition, the form does indicate that plaintiff alerted prison officials to the fact that he was a CIMS case and, therefore, that special considerations applied to review of his file. Given these facts, the undersigned does not find credible defendant's claim that plaintiff's concerns regarding the DWBs were never discussed.

---

[32] Plaintiff avers that his fears regarding the DWBs were specifically discussed, and the SIS Lieutenant "stressed the institution's steadfast refusal to place DWB's [sic] on the prison compound by noting an example of a DWB with the last name Brown who had [previously] been assigned to . . . [FCI Gilmer]. . . [he] asked the plaintiff whether he knew . . . Brown and the plaintiff [said] . . . he did. The lieutenant stated 'He came to this institution and we held him in the hole for over a year before he was transferred. We don't allow DWB's on this yard." (Dkt.# 54-1, ¶28 at 8).

Although the plaintiff alleges that the defendants were negligent in that they failed to screen and identify the individual who attacked him as a potential threat, and keep them separated, his amended complaint appears to also allege that the defendant knew of, and was deliberately indifferent to, a threat to his safety which resulted in a physical assault upon him by the DWB gang member.  (Dkt.# 54-1, ¶¶ 56-57 at 20).   This a claim properly brought in a <u>Bivens</u> complaint.  Despite this legal "jargon," the complaint clearly raises a negligence claim, not a claim of deliberate indifference.  As the Fourth Circuit has noted:

> To be sure, the original complaint throws in words and phrases such as 'deliberate indifference.' 'Malicious,' 'outrageous,' and 'wanton' when describing the conduct of the officers.  The presence, however, of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support a finding of deliberate indifference.

<u>Young v. City of Mount Ranier</u>, 238 F.3d 567, 577 (5th Cir. 2001).

Plaintiff next alleges that the Government's decision to place him in the general population where he was attacked was not grounded in public policy considerations such as "inmate safety, prison security and the effective use of prison resources," but rather, attributable to "budgetary concerns and the allocation of scarce resources.    (Dkt.# 65 at 22 - 23).   Plaintiff's argument is unavailing.  The Fourth Circuit's case law on the discretionary function exception has signaled its willingness to consider decisions that implicate budgetary concerns as sufficiently policy-based to receive immunity.  <u>See</u> <u>Williams v. United States</u>, 50 F.3d 299, 310 (4th Cir. 1995) ("Contracting out the responsibility to maintain [office space leased by the United States] while balancing fiscal considerations entails exercising judgment based on policy."); <u>Bowman v. United States</u>, 820 F.2d 1393, 1395 (4th Cir. 1987) (characterizing a decision based on "a lack of financial resources" as a "policy judgment").

Finally, in its supplemental memorandum of law in support of its motion to dismiss, the defendant contends that any claims plaintiff might raise for negligence at other BOP facilities in 2008 are time-barred, because his FTCA claim was not filed within two years of its occurrence. In response, plaintiff cites <u>Gross v. United States</u>, 676 F.2d 295 (8th Cir. 1982) (overruled on other grounds), a FTCA agricultural claim case, in support of his contention that his claim of "negligent decision-making by BOP officials" is pled as a continuing tort, with the last tortious act occurring on February 14, 2011, and therefore, is not time-barred. The undersigned agrees. While 28 U.S.C. §2401(b) states

> [a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented[,]

here, plaintiff is not making a claim for compensation for the injuries he received in the October, 2008 attack, but rather, for the BOP's continued "negligent decision-making" since that date, in failing to properly screen him, (or, alternatively, screen other inmates) to ensure his safety from subsequent DWB attacks. The law in West Virginia is that "[w]here a tort involves a continuing or repeated injury, the cause of action accrues at and the statute of limitations begins to run from the date of the last injury or when the tortious overt acts or omissions cease." <u>Roberts v. West Virginia American Water Company</u>, 221 W. Va. 373, 379, 655 S.E.2d 119 (W.Va. 2007) *quoting* <u>Graham v. Beverage</u>, 211 W.Va. 466, 566 S.E.2d 603 (2002). The West Virginia Supreme Court of Appeals noted that

> the distinguishing aspect of a continuing tort with respect to negligence actions is continuing tortious conduct, that is, a continuing violation of a duty owed the person alleging injury, rather than continuing damages emanating from a discrete tortious act. It is the continuing misconduct which serves to toll the statute of limitations under the continuing tort doctrine.

Roberts, *supra* at 379. See also Ward v. Caulk, 650 F.2d 1144 (9th Cir. 1981)(a continuing violation sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation). Accordingly, plaintiff's negligence claims for failure to protect prior to the date of February 14, 2011, are not time-barred.

In summary, the Plaintiff has filed an amended complaint, attaching very detailed affidavits which allege that FCI Gilmer was negligent in the performance of its screening duties under BOP Program Statements 5180.05 and 5290.15, and that said negligence was the proximate cause of his injuries. There is no dispute that the Plaintiff suffered serious injuries on October 31, 2008 and on February 14, 2011, and those injuries were the result of attacks by inmates who both parties acknowledge were DWB gang members, from whom plaintiff may have had documented complete separatee status in his Central File, SENTRY and CIMS records. Although the defendant's memoranda in support of its motion to dismiss also attach affidavits and exhibits, the affidavits are terse, incomplete, conclusory, and at times, conflict with facts in the record; the undersigned finds the plaintiff's affidavits more credible.[33] The amended complaint, viewed in the light most favorable to the plaintiff, is sufficient to survive the defendant's motion to dismiss. It gives the defendant fair notice of his claims, and the grounds upon which it rests. The court cannot make a determination at this stage whether mandatory procedures with the placement of plaintiff and "Bubba" in general population were followed, whether plaintiff had CIM separatee status against all DWBs, or whether the DWBs are in fact one of the Security Threat Groups that have been designated a Disruptive Group by the BOP, requiring that its members be kept segregated from other inmates. While the

---

[33] There is no prohibition against a court making credibility determinations based on competing affidavits in certain circumstances. See Tanberg v. Sholtis, 401 F.3d 1151, 1161 (10th Cir. 2005); United States v. Barsanti, 943 F.2d 428, 440 (4th Cir. 1991). Choosing between conflicting affidavits without a hearing may be reasonable when one affidavit is cryptic or conclusory with respect to a contested issue of fact and the other affidavit sets out a detailed account of events. Compare United States v. McAtee, 481 F.3d 1099, 1103 (8th Cir. 2007) (explaining that the inclusion of specific details in an affidavit was an indicator of the affiant's credibility) with United States v. Perez, 393 F.3d 457, 464 (4th Cir. 2004)(stating that a court may discount "unsupported, conclusory statements" in an affidavit).

Government insists that all proper policies with regard to plaintiff and "Bubba" were followed, the full record is not before the Court.[34]  Moreover, notably absent from the Government's response, other than an assurance that "Bubba's" intake interview and placement was properly done, is any documentation to prove it. The concern expressed in <u>Palay</u> applies to this case. "[W]ith nothing more than [Plaintiff]'s complaint to go on, [this court has] no idea what the BOP's . . .  policy in fact was, or whether the official(s) who moved ["Bubba"] acted in accord with that policy." <u>Id</u>.  A more fully developed record – one which includes not only an explanation of what the procedures were at FCI Gilmer with respect to the placement of inmates in general population; identification of which groups in the BOP are designated as Disruptive Groups; and evidence establishing that the decision to place "Bubba" in general population was discretionary after mandatory procedures were followed – may well demonstrate that the discretionary function applies to this case. However, such a determination cannot be made on the current record.

Accordingly, the amended complaint, viewed in the light most favorable to the plaintiff, is sufficient to survive the defendant's motion to dismiss.  Furthermore, when construing the defendant's Rule 12(b)(6) motion with its attached affidavits and exhibits as a motion for summary judgment, it is clear that there are genuine issues as to materials facts regarding the alleged negligence of the FCI Gilmer staff, such that a grant of summary judgment at this early stage in the proceedings would be inappropriate.  The Government may well reassert its discretionary function exception argument at a later stage of these proceedings.

## IV.  Recommendation

---

[34] The plaintiff  has indicated he intends to request discovery on matters including production of what was in his  transfer package regarding his DWB separatee status, from USP Lewisburg, FCP Springfield, and USM McCreary.  Moreover, plaintiff correctly notes that he presently does not have access to the CIM Operations Manual, a "Limited Official Use Document," which might provide further information relevant to his claims.

In consideration of the foregoing, it is the undersigned's recommendation that the defendant's Motion to Dismiss (Dkt.# 27) be DENIED and that a scheduling Order be entered.

Within **fourteen (14) days** after being served with a copy of this recommendation, **or by August 20, 2012**, any party may file with the Clerk of the Court written objections identifying the portions of the recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985) Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied,* 467 U.S. 1208 (1984).

The Clerk of Court is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet. The Clerk of the Court is further directed to provide a copy of this Report and Recommendation to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

Dated: August 6, 2012

> /s/ James E. Seibert
> JAMES E. SEIBERT
> UNITED STATES MAGISTRATE JUDGE